981 So.2d 371 (2007)
ALFA MUTUAL INSURANCE COMPANY, Alfa Mutual General Insurance Company, and Alfa Mutual Fire Insurance Company
v.
CITY OF MOBILE and the City of Mobile, Alabama, Police and Firefighters Retirement Plan.
1051747.
Supreme Court of Alabama.
June 8, 2007.
As Modified on Denial of Rehearing September 28, 2007.
*372 Frederick G. Helmsing and Patrick C. Finnegan of Helmsing, Leach, Herlong, Newman & Rouse, P.C., Mobile, for appellants.
D. Charles Holtz of Bowron, Latta & Wasden, P.C., Mobile; and Wanda J. Cochran, Mobile, for appellees.
Timothy H. Nunnally, sr. assoc. city atty., Tuscaloosa, for amicus curiae City of Tuscaloosa, in support of the appellees' application for rehearing.
K. Claudia Anderson, asst. city atty., Huntsville, for amicus curiae City of Huntsville, in support of the appellees' application for rehearing.
Lorelei A. Lein, deputy gen. counsel, Alabama League of Municipalities, Montgomery, for amicus curiae Alabama League of Municipalities, in support of the appellees' application for rehearing.
Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for amicus curiae Property Casualty Insurers Association of America in opposition to the appellees' application for rehearing.
STUART, Justice.
The City of Mobile ("the City") and the City of Mobile, Alabama, Police and Firefighters Retirement Plan ("the Retirement Plan") sued Alfa Mutual Insurance Company ("AMIC"), Alfa Mutual General Insurance Company ("AMGIC"), and Alfa Mutual Fire Insurance Company ("AMFIC") (collectively referred to as the "Alfa companies") in the Mobile Circuit Court, alleging *373 that the Alfa companies failed to pay certain license taxes from 1995 through 1998 and failed to make required contributions to the Retirement Plan from 1995 through 1999. The trial court entered a summary judgment in favor of the City and the Retirement Plan, and the Alfa companies now appeal. We reverse and remand.

I.
Municipalities in Alabama are permitted by § 11-51-90, Ala.Code 1975, to impose a license tax on businesses operating within their corporate limits and by § 11-51-91, Ala.Code 1975, to impose a license tax on businesses operating within their police jurisdictions. However, the legislature has specifically capped the rate at which such a license tax may be imposed upon insurance companies. Section 11-51-120, Ala.Code 1975, caps the rate of the license tax municipalities may impose on "any fire or marine insurance company" at 4%:
"No license or privilege tax or other charge for the privilege of doing business shall be imposed by any municipal corporation upon any fire or marine insurance company doing business in such municipality except upon a percentage of each $100.00 of gross premiums, less return premiums, on policies issued during the preceding year on property located in such municipality. Such percentage shall not exceed four percent on each $100.00 or major fraction thereof of such gross premiums. . . . "
Section 11-51-121, Ala.Code 1975, caps the license tax municipalities the size of Mobile may impose on "any insurance company, other than fire and marine insurance companies" at 1% (plus $50):
"(a) No license or privilege tax or other charge for the privilege of doing business shall be imposed by any municipal corporation upon any insurance company, other than fire and marine insurance companies, doing business therein or its agents which shall exceed for the company and its agents the following amounts:
". . . .
"(4) Each such insurance company, in cities and towns having a population of more than 50,000, $50.00 and $1.00 on each $100.00 and major fraction thereof of gross premiums, less return premiums, received during the preceding year on policies issued during said year to citizens of said cities and towns."
Thus, these two statutes (hereinafter collectively referred to as "the license-tax statutes") set a maximum tax rate of 4% for fire and marine insurance companies and a maximum tax rate of 1% (plus $50) for insurance companies other than fire and marine insurance companies.
In 1994, the City, pursuant to the authority granted it in §§ 11-51-90 and 11-51-91, passed Ordinance No. 34-085 ("the license-tax ordinance"), which imposed the following license taxes upon insurance companies operating in Mobile:
"(a) Fire and marine insurance. Each person, firm or corporation doing business in the City of Mobile shall pay $4.00 on each $100.00 and major fraction thereof of the gross premiums on policies issued for the preceding calendar year on property located in the City of Mobile and police jurisdiction thereof, less premiums returned by cancellation. . . .
"(b) Other insurance. Each person, firm or corporation doing any other kind of business than those specified in subdivisions (a), (c), and (e) shall pay $50.00 and $1.00 on each $100.00 and major fraction thereof of gross premiums received, less the premiums returned by cancellation, received during the preceding year on policies issued during the *374 preceding year to citizens of the City of Mobile and police jurisdiction thereof.
"(c) Mutual aid association. Same as fire and marine insurance.
"(d) Persons, firms, or corporations writing own insurance shall pay same license as other agents or agencies. Provided, that this shall not apply to Knights of Pythias, Odd Fellows and such incorporated fraternal orders.
"(e) Auto, fire, theft, or collision insurance. Same rate as fire and marine insurance."
Thus, the license-tax ordinance placed no import on whether a company was a "fire or marine insurance company" or an "insurance company, other than fire and marine insurance companies," as those terms are used in the license-tax statutes. Rather, the license-tax ordinance placed a 4% tax on premiums for fire and marine insurance and a 1% tax on premiums for other insurance, regardless of the nature and character of the insurance company issuing the insurance and collecting the premiums. The City reenacted the license-tax ordinance throughout the period in question.
During this time, the Alfa companies operated in the City and sold various types of insurance to customers within the City and its police jurisdiction. Each of the Alfa companies was licensed by the City and paid annual license taxes based on the gross insurance premiums collected. AMFIC sold policies in 1995 and 1996 and paid the City license taxes at the rate of 4% on the premiums collected for all those policies, the rate applicable to fire-insurance companies.[1] AMIC and AMGIC sold policies throughout the period from 1995 through 1998 and paid the City license taxes at the rate of 1% (plus $50) on the premiums collected for all those policies, the rate applicable to insurance companies other than fire and marine insurance companies.
Since 1951, Alabama law has also required certain insurance companies operating in Mobile to make contributions to the Retirement Plan. Act No. 91-701, Ala. Acts 1991 ("the 1991 Pension Act"), states that requirement as follows:
"Each insurance company writing fire insurance on property within the city limits of the city of Mobile and its police jurisdiction on or before the first day of March of each year, shall pay to the city of Mobile a sum equal to four percent (4%) of its gross amount of premiums, including all renewal premiums, less return premiums, collected by such companies on policies in effect during the preceding year in such municipality and its police jurisdiction. One-half (1/2) of said sum shall be credited to said pension fund."
The 1991 Pension Act did not define "fire insurance," and the Alfa companies took the position that the term meant only actual fire-insurance policies, not any insurance policy that provided any coverage against the risk of loss by fire. Only AMIC and AMFIC issued fire-insurance policies in Mobile between 1995 and 1997, and they made contributions to the Retirement Plan during that period in accordance with their interpretation of the 1991 Pension Act. AMGIC did not issue fire-insurance policies; it accordingly made no contributions to the Retirement Plan.
In 1997, the legislature enacted Act No. 97-689, Ala. Acts 1997 ("the 1997 Pension Act"), which was substantially identical to the 1991 Pension Act but which contained in Art. 6, § 6.03(d), an additional provision stating:

*375 "For purposes of this section, `fire insurance' means any line which insures property against the risk of loss by fire, including homeowners' and vehicle policies. Where a policy issued has more than one type of coverage, the company shall pay only on that portion of the premium attributable to the fire coverage."
In spite of this language defining the term "fire insurance," the Alfa companies in 1998 and 1999 continued to make contributions to the Retirement Plan as they had under the 1991 Pension Act, i.e., AMIC making contributions and AMGIC not, based only on the value of actual fire-insurance policies sold.
The City and the Retirement Plan thereafter discovered that the Alfa companies were not paying all the license taxes and making all the contributions to the Retirement Plan that the City and the Retirement Plan believed were required by law. In June 2001, the City and the Retirement Plan sued the Alfa companies seeking to recover the allegedly unpaid sums, plus interest and penalties. In their final amended nine-count complaint, the City claimed in counts one through four ("the license-tax claims") that AMIC and AMGIC owed additional license taxes for the years 1995, 1996, 1997, and 1998. In counts five through nine ("the pension-fund claims"), the City and the Retirement Plan claimed that the Alfa companies were obligated to make additional contributions to the Retirement Plan for the years 1995, 1996, 1997, 1998, and 1999. The Alfa companies denied liability on all counts and counterclaimed to recover license taxes and contributions to the Retirement Plan they alleged they overpaid or paid under the license-tax ordinance, which they alleged was invalid.
In November 2004, the City and the Retirement Plan moved for a partial summary judgment on the pension-fund claims. After the Alfa companies responded and a hearing was held, the trial court granted the City and the Retirement Plan's motion and entered a partial summary judgment in their favor. Thereafter, AMIC and AMGIC moved for a summary judgment on the license-tax claims, as did the City. On July 27, 2006, the trial court granted the City's motion for a summary judgment on the license-tax claims. On September 6, 2006, the trial court entered a final judgment in favor of the City and the Retirement Plan on all claims. The Alfa companies appeal the judgment entered on all the license-tax claims and on the pension-fund claims for the years 1995, 1996, and 1997. They do not appeal the judgment entered on the pension-fund claims for the years 1998 and 1999, after the enactment of the 1997 Pension Act.

II.
The relevant facts in this case are not disputed. Rather, the Alfa companies argue that the judgment entered by the trial court is premised on an erroneous interpretation of the relevant statutes and acts. "This Court reviews de novo a trial court's interpretation of a statute, because only a question of law is presented." Scott Bridge Co. v. Wright, 883 So.2d 1221, 1223 (Ala.2003).

III.
We first consider the judgment entered for the City on the license-tax claims. The Alfa companies argue that the license-tax statutes, as well as the caselaw interpreting those statutes, indicate that for license-tax purposes an insurance company must be classified as either: 1) a fire and marine insurance company, or 2) an insurance company other than a fire and marine insurance company. Once classified, the Alfa companies argue, an *376 insurance company cannot be taxed at a rate greater than the cap set by the legislature4% for fire and marine insurance companies and 1% for other types of insurance companies. The City, however, disputes that an insurance company must absolutely be classified either as a fire or marine insurance company or as an insurance company other than a fire or marine insurance company. Rather, the City argues, every insurance company is a fire-insurance company to the extent it sells fire insurance. Thus, even if an insurance company is not, generally speaking, a fire-insurance company, the City argues that that company is still subject to the 4% license tax on the fire insurance that it does issue. For the reasons that follow, we disagree.
This issue is primarily one of statutory interpretation and, as this Court has previously stated, "[t]he cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute." Ex parte State Dep't of Revenue, 683 So.2d 980, 983 (Ala.1996) (citing Gholston v. State, 620 So.2d 719 (Ala.1993)). We think it sufficiently clear from the language used in the license-tax statutes that the legislature intended to create two mutually exclusive categories in which to place insurance companies for license-tax purposes. Section 11-51-120 states that it applies to "any fire or marine insurance company," and § 11-51-121 states that it applies to "any insurance company, other than fire and marine insurance companies." These two categories are all inclusive, that is, every insurance company must fit within one of the two classifications. Although what constitutes a "fire-insurance company" is not defined, the fact remains that every insurance company either is a fire-insurance company or is not a fire-insurance company. Or, to use the statutory language, every insurance company is either a "fire or marine insurance company" or an "insurance company, other than fire and marine insurance companies."
This Court has recognized the above dichotomy in previous cases interpreting the forerunners to the license-tax statutes. In Motors Insurance Corp. v. City of Birmingham, 269 Ala. 339, 341, 113 So.2d 147, 148 (1959), this Court prefaced its opinion by stating that "[i]n regard to municipal licenses, the legislature has divided insurance companies into two classifications, (1) fire and marine insurance companies and (2) insurance companies other than fire and marine." Moreover, in City of Birmingham v. State Farm Mutual Automobile Insurance Co., 382 So.2d 1111 (Ala. 1980), this Court considered the same statutes at issue in this case and reaffirmed that every insurance company is either a fire and marine insurance company or an insurance company other than a fire and marine insurance company.
City of Birmingham v. State Farm is particularly instructive on this point because the same issues were involved. This Court stated then:
"The basis of the lawsuit is Birmingham's assertion that § 11-51-120 applies to State Farm, not § 11-51-121; that is, that State Farm Mutual Automobile Insurance Company (not to be confused with its subsidiary company, State Farm Fire and Casualty Company) is a `fire insurance company' issuing policies `on property located' in Birmingham, and therefore that State Farm is obliged to pay a privilege tax of four percent on each $100.00 of its gross premiums earned in Birmingham. State Farm's position is that it is a `casualty insurance' company and therefore is an insurance company `other than fire and marine,' and thus is obligated to pay the *377 lesser privilege tax of one percent on each $100.00 (plus $50.00) called for under § 11-51-121.
"Having been unable to resolve the question administratively, State Farm brought this action to have the Jefferson County Circuit Court declare that it should be taxed under § 11-51-121. By counterclaim Birmingham sought to make State Farm liable for privilege taxes for 1978 and retroactively to 1973, plus penalties and interest for State Farm's refusal to pay the amount allegedly owed. Following an evidentiary hearing the trial court declared that State Farm was not a fire insurance company under § 11-51-120, but was a company `other than [a] fire and marine insurance compan[y]' and thus subject to § 11-51-121. Birmingham appeals.
"The issues presented by the parties focus initially upon the interpretations to be given these two statutes. Birmingham insists that these statutes and their predecessors, Act No. 163, Acts of Alabama, 1927, pp. 150-151; Act No. 194, Acts of Alabama, 1935, pp. 552-553; Tit. 37, §§ 736 (`other than fire and marine insurance companies') and 739 (`any fire or marine insurance company'), established classifications based upon `property' or `people.' There is, states Birmingham, one classification authorizing a tax measured by four percent of premiums received from policies `on property located in [the] municipality' (see § 11-51-120), while another classification authorizes a tax measured by one percent of premiums received from policies issued `to citizens of said cities and towns' (see § 11-51-121(a)(4)). According to Birmingham, these are separate classifications which relate to the business conducted, and the business conducted by State Farm is the selling of `automobile physical damage insurance.' That kind of insurance, Birmingham contends, is `property' insurance which is a class of `fire insurance,' making State Farm a fire insurance company."
382 So.2d at 1112-13. After considering the parties' arguments, this Court ultimately accepted the position advocated by State Farm and affirmed the judgment of the trial court. In doing so, this Court acknowledged that classifying insurance companies using only the two categories created by the legislature was not easy, "because of the historical development of insurance companies, the gradual expansion of coverages, and the fact that companies organized for one type of risk (e.g., fire) might actually write other coverages partially or exclusively." 382 So.2d at 1114. Thus, this Court in City of Birmingham v. State Farm was cognizant of the fact that an insurance company other than a fire-insurance company might write some fire insurance, but the Court nevertheless recognized that it was obligated to use the classification system provided by the legislature and to categorize an insurance company as either a "fire and marine insurance company" or an "insurance company, other than fire and marine insurance companies."[2] Since City of Birmingham v. State Farm was decided in 1980, the legislature has not amended the license-tax statutes, and we must consider the legislature's inaction in our decision today. See Hexcel Decatur, Inc. v. Vickers, 908 So.2d 237, 240 (Ala.2005) ("[R]egardless of how this Court might today decide this question if writing on a clean slate, we are not doing so and we must now decide this question in light of [our previous decision] *378 and the subsequent inaction of the Legislature.").
Notwithstanding the unambiguous language of the license-tax statutes and our previous caselaw interpreting those statutes, the City argues that insurance companies need not be categorized as simply "fire and marine insurance companies" or "insurance compan[ies], other than fire and marine insurance companies" and taxed entirely at the corresponding rate. Rather, the City argues, insurance companies should be taxed at the 4% rate on the fire-insurance policies they sell and at the 1% rate on the other insurance policies they sell. In support of this argument, the City cites § 11-51-95, Ala.Code 1975, which was not cited in City of Birmingham v. State Farm, and which, at the times pertinent to this action, provided:[3]
"Any person, firm or corporation dealing in two or more of the articles or engaged in two or more of the businesses, vocations, occupations or professions for which a license is or may be required shall take out and pay for a license for each line of business, vocation, occupation or profession."
In conjunction with § 11-51-95 the City argues that the Alfa companies are engaged in two separate lines of business the sale of fire insurance and the sale of insurance other than fire insuranceand that they may be taxed accordingly. The Alfa companies dispute that characterization and argue that they are engaged in a single line of businessthe sale of insurance.
However, regardless of whether the sale of fire insurance and the sale of insurance other than fire insurance constitute separate lines of business, § 11-51-95 is inapplicable to the present case because, "[w]here statutes in pari materia are general and specific, the more specific statute controls the more general statute." Crawford v. Springle, 631 So.2d 880, 882 (Ala. 1993) (citing Ex parte Coffee County Comm'n, 583 So.2d 985 (Ala.1991)). Section 11-51-95, as it read at the relevant time, was a general statute governing the licensing of all persons, firms, or corporations engaged in "businesses, vocations, occupations or professions for which a license is or may be required." The license-tax statutes, on the other hand, are specific statutes governing the licensing of insurance companies. Therefore, if there was a conflict between § 11-51-95 and the license-tax statutes, the license-tax statutes controlled.
The City argues that there was no conflict between the statutes, and that the City's interpretation is consistent with the principle that "`[s]tatutes should be construed together so as to harmonize the provisions as far as practical.'" Dollar v. City of Ashford, 677 So.2d 769, 770 (Ala. Civ.App.1995) (quoting Ex parte Jones Mfg. Co., 589 So.2d 208, 211 (Ala.1991)). However, this argument fails when the language of the statutes is examined. Section 11-51-121 forbids a municipality the size of the City from imposing upon an insurance company, other than a fire or marine insurance company, any "license or privilege tax or other charge for the privilege of doing business" other than a tax not exceeding 1% (plus $50) on premiums "received during the preceding year on policies issued during said year to citizens of said cities and towns." Clearly, a 4% tax on fire-insurance policies issued by that same company would have to be considered just such an additional license, tax, or charge, even if we were to uphold the City's argument that the tax was authorized *379 under § 11-51-95. Thus, the statutes conflicted, and § 11-51-95 must accordingly give way to the specific license-tax statutes.
The City also argues that interpreting the license-tax statutes in the manner the Alfa companies advocate would be unreasonable because a fire-insurance company could lessen its tax burden merely by expanding its offerings to include additional lines of insurance so that the insurance company was no longer considered only a fire-insurance company:
"The unreasonableness of Alfa's argument is also exemplified by contrasting the effect of Alfa's argument with the hypothetical set out by the trial court. If Delta Company sells only fire insurance and is paid $400,000 in premiums, it would be deemed entirely a fire insurance company and its license tax would be $16,000 since it would all be at the 4% rate. In contrast, if Sigma Company receives the same amount for the issuance of fire policies, plus $600,000 for the issuance of other policies, under Alfa's argument it would pay only $10,000 in license tax at the 1% rate because it would say that it is an `other' insurance company. It is completely illogical for Sigma to get a $6,000 reduction in license taxes because it receives $600,000 in non-fire premiums on top of the same amount of fire premiums that Delta Company receives."
The City and the Retirement Plan's brief, p. 48 (emphasis omitted; internal citations to record omitted). In the alternative, the City argues that strict adherence to the two categories created in the license-tax statutes could even result in the unreasonable result of some premiums avoiding taxation altogether:
"Using Alfa's interpretation, for a company selling both fire and other insurance that is classified as only a fire insurance company, we would look solely to § 11-51-120. It states that the maximum tax is to be calculated `upon a percentage of . . . premiums . . . on policies issued . . . on property located in such municipality.' This statute does not provide for a license tax on premiums on policies that are not `on property.' Thus, regardless of the amount of premiums received by the company for health or casualty policies, under this statute the tax would be payable only on the basis of the premiums for policies on property. Using Alfa's argument, only § 11-51-120 would apply and the remaining premiums would not even be subject to tax, unless the words `on property' are ignored."
The City and the Retirement Plan's brief, p. 49 (emphasis omitted).
However, regardless of this Court's view of the reasonableness or ultimate wisdom of the language used in a duly enacted statute, we are bound to interpret that language to mean exactly what it says. As we stated in DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala.1998):
"It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala.1997)."
We cannot say that the license-tax statutes, when interpreted as written, lead to an absurd result that would make it necessary *380 for this Court to "look beyond those words." Id. For that reason, we are bound to use the classification system created by the legislature, and we therefore hold that every insurance company is either: 1) a "fire and marine insurance company," in which case a municipality may impose, pursuant to § 11-51-120, a license tax of up to 4% upon all of the policies issued by that company on property located within that municipality, or 2) an "insurance company, other than fire and marine insurance companies," in which case a municipality may impose, pursuant to § 11-51-121, a license tax of 1% (plus the authorized statutory fee) upon all of the policies issued by that company on policies issued to citizens of that municipality.
We now must consider whether AMIC and AMGIC should be classified as fire and marine insurance companies or as insurance companies other than fire and marine insurance companies. In making that determination we rely on the "functional" test adopted by this Court in City of Birmingham v. State Farm:
"It is notable that in [City of Sheffield v. Home Insurance Co., 234 Ala. 382, 174 So. 779 (1937), and City of Sheffield v. General Exchange Insurance Corp., 234 Ala. 386, 174 So. 782 (1937),] and in [Motors Ins. Corp. v. City of Birmingham, 269 Ala. 339, 113 So.2d 147 (1959),] as well, both the trial court and this Court looked to the evidence to determine the nature of the insurance company. Indeed, the emphasis of the statutes under consideration is not upon the amount of earned premium allocable to fire insurance, but upon the character of the company itself. The arguments of counsel for both sides take this position. Under these statutes the amount of premium so allocable is one, but only one, incident or element of that character. The record discloses that State Farm does not in fact write a separate policy covering only automobile physical damage risks. Instead the company issues one policy making available the following coverages: bodily injury and property damage liability, medical payments, comprehensive, collision, uninsured motor vehicle, automobile death indemnity and specific disability, total disability and loss of earnings, emergency road service, and automobile rental reimbursement. The comprehensive coverage pays for loss to the vehicle (except from collision) due to missiles, falling objects, theft, larceny, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandalism, riot or civil commotion, collisions with birds or animals, and fire. (The company also writes health and accident policies.) This evidence justifies State Farm's contention that it is a `casualty' company, the classification, incidentally, which it occupies with the State Department of Insurance for rate regulation as well as for State Taxation. Examination of the evidence supports the finding of the trial court, therefore, that State Farm falls into the category of `other than fire and marine.' And because we have no legislative guidance on the proper classification to be accorded to any particular company, this functional test is the appropriate test to apply in individual cases. In other words, the nature of the principal business endeavor, as manifested by its charter, its activities and its operations, will control the application of the classifications established by §§ 11-51-120, -121."
382 So.2d at 1114-15. In its order granting the City's motion for a summary judgment on the license-tax claims, the trial court purported to apply this functionality test to AMIC and AMGIC and concluded, in a footnote, that they were both fire-insurance companies:

*381 "The court notes for purposes of the record that should it solely rely on [City of Birmingham v. State Farm Mutual Automobile Insurance Co., 382 So.2d 1111 (Ala.1980),] as [AMIC and AMGIC] urge, the `functionality' test proposed by the [City of Birmingham v. State Farm] court would dictate that AMIC and AMGIC should be classified as `fire insurance' companies because property insurance, as `fire' insurance is now known, is the principal endeavor of both companies, manifested by their charters, their activities and operations as more fully set forth in the undisputed facts."
For the reasons that follow, we disagree with that conclusion.
In applying the City of Birmingham v. State Farm functionality test to AMIC and AMGIC, we seek to identify the nature of their respective "principal business endeavor[s]," by examining each company's charter, activities, and operations. 382 So.2d at 1115. In regard to AMIC's and AMGIC's charters, it is undisputed that neither company was chartered as a fire-insurance company. This fact weighs in favor of a finding that AMIC and AMGIC are insurance companies other than fire and marine insurance companies.
The City, however, argues that AMIC and AMGIC's activities and operations are consistent with a finding that they are both fire-insurance companies. In support of this argument, the City notes that both companies, in their articles of incorporation, assumed the right to sell fire insurance and that both companies do in fact sell such insurance. However, while that is true, both companies, in their articles of incorporation, claimed broad powers and simultaneously claimed the right to sell disability insurance, automobile insurance, liability insurance, steam-boiler insurance, use and occupancy insurance, allied lines of insurance, and all other lawful types of insurance. Thus, the mere fact that AMIC and AMGIC claimed the right to sell fire insurance is no more indicative of a finding that they are fire-insurance companies than it is a finding that they are "steam-boiler" insurance companies.
More relevant is the amount of fire insurance AMIC and AMGIC did in fact sell during the years in question. Even that is difficult to quantify, however, because the City and AMIC and AMGIC do not agree on what constitutes "fire insurance." The City argues, and the trial court agreed, that AMIC and AMGIC's homeowner, tenant, manufactured-home, farm-owner, business-owner, scheduled-property, personal-articles, machinery and livestock floater, and watercraft-package policies should all be considered "fire insurance" because more than 90% of the losses paid under those policies are for standard fire-insurance-type losses. AMIC and AMGIC, however, argue that only approximately 8.5% and 26.5%, respectively, of the premiums they received during the time in question were allocable to fire coverage.
However, regardless of how fire insurance is defined, our previous caselaw makes it clear that the sale of fire insurance was neither AMIC's nor AMGIC's principal business endeavor. In City of Birmingham v. State Farm, Birmingham claimed that State Farm was a fire-insurance company based on the fact that State Farm sold automobile physical-damage coverage, which, Birmingham claimed, was a type of property insurance that is, in turn, a type of fire insurance. 382 So.2d at 1113. However, this Court found it to be crucial that State Farm did not, in fact, issue a policy covering only physical damage to automobiles. Rather, State Farm issued a single comprehensive policy making available multiple types of coverage, including bodily-injury and property-damage liability, medical payments, compre-hensive, *382 collision, uninsured motor vehicle, automobile-death indemnity and specific disability, total disability and loss of earnings, emergency road service, and automobile-rental reimbursement. Coupled with the facts that State Farm was not chartered as a fire-insurance company and had never classified itself as a fire-insurance company, this Court concluded that State Farm was an insurance company other than a fire or marine insurance company. 382 So.2d at 1115.
AMIC and AMGIC have submitted evidence indicating that 65% of the premiums earned by AMIC and 55% of the premiums earned by AMGIC during the years in question come from comprehensive automobile policies markedly similar to those sold by State Farm in City of Birmingham v. State Farm, which this Court determined were not fire insurance. Thus, even if this Court were to agree with the City's position that AMIC and AMGIC's homeowner, tenant, manufactured-home, farm-owner, business-owner, scheduled-property, personal-articles, machinery and livestock floater, and watercraft-package policies should all be considered fire insurance, it would nevertheless be true that the majority of AMIC and AMGIC's business was attributable to the type of automobile policies this Court previously held were not fire insurance. In light of this fact, we cannot say that the sale of fire insurance was the principal business endeavor of those companies. Thus, under the functionality test adopted by this Court in City of Birmingham v. State Farm, AMIC and AMGIC are properly classified for license-tax-statute purposes as insurance companies other than fire and marine insurance companies.[4] Accordingly, the summary judgment in favor of the City and against AMIC and AMGIC on the license-tax claims is due to be reversed.

IV.
We next consider the summary judgment entered on the pension-fund claims for the years 1995, 1996, and 1997. These claims hinge on language in the 1991 Pension Act that requires "each insurance company writing fire insurance on property" in Mobile or its police jurisdiction to pay the City 4% of the gross premiums collected on that insurance with half of that sum (2%) to be credited to the Retirement Plan. The 1991 Pension Act does not define the term "fire insurance," and the City and the Retirement Plan take the expansive view that the term includes any insurance against the risk of loss by fireregardless of the type of policy that coverage is found inwhile the Alfa companies take the more narrow view that the term refers only to fire-insurance policies per se.
The City and the Retirement Plan make essentially two arguments in support of their interpretation of the 1991 Pension Act. First, they argue that this Court endorsed their perspective in State Farm Mutual Automobile Insurance Co. v. Board of Trustees of Firemen's Pension & Relief Fund, 291 Ala. 250, 279 So.2d 512 (1973), in which this Court considered Act No. 307, Ala. Acts 1943, an act similar to the 1991 Pension Act, in that it also provided for the funding of a firefighters' retirement plan, albeit in the City of Birmingham. *383 However, although Act No. 307 is similar in purpose to the 1991 Pension Act, there is at least one important difference in the language used in the two acts. Act No. 307 states, in relevant part:
"[I]t shall not be lawful for such fire insurance company or its agent, to take or receive any premium for insurance against fire within such city, unless such fire insurance company shall pay, at the time aforesaid, to the said Firemen's Pension and Relief Fund, the amount herein provided to be paid by such fire insurance company. . . . "
(Emphasis added.) Importantly, instead of just using the undefined term "fire insurance," Act No. 307 specifically refers to "any premium for insurance against fire." The 1991 Pension Act contains no such language. Thus, although this Court in Firemen's Pension & Relief Fund interpreted Act No. 307 to require the insurance company to make payments to the retirement plan in accordance with the value of all premiums insuring against the risk of loss by fire, not just fire-insurance policies per se, 291 Ala. at 256, 279 So.2d at 516-17, that holding is of little guidance in the present case because of the differences in the language of the two acts.
The City and the Retirement Plan next argue that the 1997 Pension Act is itself evidence that their interpretation of the 1991 Pension Act is correct. The 1997 Pension Act was substantially identical to the 1991 Pension Act but contained an additional provision explicitly stating that "[f]or purposes of this section, `fire insurance' means any line which insures property against the risk of loss by fire. . . ." Art. 6, § 6.02(d). Thus, in 1997 the legislature amended the law to explicitly comport with the position taken by the City and the Retirement Plan. Citing these facts, the City and the Retirement Plan quote McWhorter v. State Board of Registration for Professional Engineers, 359 So.2d 769, 773 (Ala.1978), for the proposition that the 1997 Pension Act was the legislature's attempt to remove any doubt caused by ambiguities in the 1991 Pension Act:
"When statutes are amended or replaced by succeeding legislation, the Legislature often seeks to clarify previously ambiguous provisions. These subsequent acts by the legislature must be considered in trying to determine the intent of the legislation. 73 Am.Jur.2d., Statutes § 178."
However, although the 1997 Pension Act might be of assistance when interpreting the 1991 Pension Act, that is true only if, in fact, the 1991 Pension Act is ambiguous. We agree that the 1991 Pension Act is ambiguous insofar as what is meant by the term "fire insurance"; however, rather than leading to the result the City and the Retirement Plan seek, it instead leads to the opposite result based on the principle that ambiguous taxing statutes must be construed in favor of the taxpayer. City of Mobile v. GSF Props., Inc., 531 So.2d 833, 837-838 (Ala.1988). The City and the Retirement Plan acknowledged in the trial court that this rule is applicable to the 1991 Pension Act, and, because the Alfa companies' construction of the 1991 Pension Act is, at the very least, rational, this principle mandates a judgment in their favor on the appealed pension-fund claims. Accordingly, the summary judgment entered in favor of the City and the Retirement Plan and against the Alfa companies on the pension-fund claims for the years 1995, 1996, and 1997 is due to be reversed.

V.
The City and the Retirement Plan sued the Alfa companies, alleging that they had underpaid their license taxes from 1995 through 1998 and that they had failed to make required contributions to the Retirement Plan from 1995 through 1999. The *384 trial court entered a summary judgment in favor of the City and the Retirement Plan on all counts, and the Alfa companies appealed that judgment, arguing that the trial court had misinterpreted the relevant statutes and acts. We agree, and we hereby reverse the judgment entered by the trial court with respect to all the license-tax claims and with respect to the pension-fund claims for the years 1995, 1996, and 1997 and remand the case.
REVERSED AND REMANDED.
SEE, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
COBB, C.J., and MURDOCK, J., dissent.
LYONS, J., recuses himself.
MURDOCK, Justice (dissenting).
After careful consideration of the various statutes at issue, including not only §§ 11-51-120 and -121, but also § 11-51-95, as it read before a recent amendment, and taking into consideration applicable rules of statutory construction, I am compelled to dissent from the main opinion.
I begin by noting that, in my opinion, the main opinion gives too much import to the legislature's use of the phrase "fire or marine insurance company" in a statute, § 11-51-120, that places a 4% cap on the license tax that can be assessed on premiums charged for fire-insurance policies. This phraseology is consistent with the fact that, until recently in our history, insurance companies traditionally sold only one line of insurance. It also is consistent with an attempt by the legislature to place a limit on the taxing of certain types of insurance, rather than on the companies themselves.
Addressing the inefficient and unusual results achieved by interpreting the language of these statutes as rigidly applying to only certain types of companies, rather than certain types of insurance, the main opinion quotes the following passage from DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala.1998):
"It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala. 1997)."
(Emphasis added.) I believe the greater concern with respect to "turn[ing] this Court into a legislature body" follows from an effort to interpret the statutes as imposing different tax rates on different types of companies, rather than on different types of insurance.
After using the phrase "fire or marine insurance company" in § 11-51-120, nowhere does the legislature fulfill the legislative function of providing a definition that will allow us to discern which companies fall within that phrase and which companies do not. Accordingly, applying a company-based, rather than a policy-based, interpretation of the statutes puts this Court in the position of legislating what it means to be a "fire-insurance company." Should we consider the company's charter, its bylaws, the dollar amount of premiums sold for each type of insurance, profits made by the company on each type of insurance, the numbers of policies sold of each type of insurance, the percentage of a company's budget devoted to the business of one type of insurance versus another, the percentage of a company's *385 employees involved in the marketing and servicing of one type of policy versus another, the company's history, or the company's overall culture, including perhaps which type of policy was first marketed by the company? Further, once we decide which among these factors and possibly others are to be included in the calculus, we are put into the position of deciding what weight to be accorded each factor. I am more concerned that this Court will be taking on the task of a legislative body by deciding the answers to these questions than it would be in giving the statutes the more reasonable interpretation urged upon us by the City.
The City correctly points out that a company-based interpretation of the statutes would lead to irrational results that this Court cannot reasonably conclude were intended by our legislature. Among other things, the City argues as follows:
"The unreasonableness of Alfa's argument is also exemplified by contrasting the effect of Alfa's argument with the hypothetical set out by the trial court. If Delta Company sells only fire insurance and is paid $400,000 in premiums, it would be deemed entirely a fire insurance company and its license tax would be $16,000 since it would all be at the 4% rate. In contrast, if Sigma Company receives the same amount for the issuance of fire policies, plus $600,000 for the issuance of other policies, under Alfa's argument it would pay only $10,000 in license tax at the 1% rate because it would say that it is an `other' insurance company. It is completely illogical for Sigma to get a $6,000 reduction in license taxes because it receives $600,000 in non-fire premiums on top of the same amount of fire premiums that Delta Company receives."
The City and the Retirement Plan's brief, p. 48 (emphasis omitted; internal citations to record omitted). The City further argues that strict adherence to a two-category, company-based interpretation of the statutes could even result in the unreasonable result of some premiums avoiding taxation altogether:
"Using Alfa's interpretation, for a company selling both fire and other insurance that is classified as only a fire insurance company, we would look solely to § 11-51-120. It states that the maximum tax is to be calculated `upon a percentage of . . . premiums . . . on policies issued . . . on property located in such municipality.' This statute does not provide for a license tax on premiums on policies that are not `on property.' Thus, regardless of the amount of premiums received by the company for health or casualty policies, under this statute the tax would be payable only on the basis of the premiums for policies on property. Using Alfa's argument, only § 11-51-120 would apply and the remaining premiums would not even be subject to tax, unless the words `on property' are ignored."
The City and the Retirement Plan's brief, p. 49 (emphasis omitted).
The City's arguments have obvious merit and should weigh heavily in our interpretation of the statutes. "A statute should be construed not only in light of its language, but also in light of its purpose, its object, its relation to other laws, and the conditions that may arise under its provisions." Ex parte Edwards, 816 So.2d 98, 106 (Ala.2001). Furthermore, "[i]t is a well established rule of statutory interpretation that the law favors rational and sensible construction. . . ." Crowley v. Bass, 445 So.2d 902, 904 (Ala.1984).
It is not necessary, however, to rely merely on the unreasonableness of a company-based interpretation of §§ 11-51-120 and -121 in order to conclude that the City's interpretation of the statutes is correct. This is so because the legislature *386 has chosen to fulfill its legislative function in a manner that expressly guides us to this conclusion. Specifically, the legislature expressly provided in § 11-51-95[5] as follows:
"Any person, firm or corporation dealing in two or more of the articles or engaged in two or more of the businesses, vocations, occupations or professions for which a license is or may be required shall take out and pay for a license for each line of business, vocation, occupation or profession."
The result of this language is, in my opinion, unavoidable. The legislature has expressly provided that a company selling more than one line of insurance must pay business license taxes separately on each line of insurance. "[S]tatutes must be construed in pari materia in light of their application to the same general subject matter. Our obligation is to construe provisions `in favor of each other to form a harmonious plan,' if it is possible to do so." Opinion of the Justices No. 334, 599 So.2d 1166, 1168 (Ala.1992) (citations omitted).[6]
Based on the foregoing, I must respectfully dissent.[7]
COBB, C.J., concurs.
NOTES
[1] In 1996, AMFIC transferred all of its fire-insurance policies to AMIC.
[2] That categorization is, in turn, dependent on "the character of the company itself," that is, "the nature of [its] principal business endeavor, as manifested by its charter, its activities and its operations." City of Birmingham v. State Farm, 382 So.2d at 1114-15.
[3] Section 11-51-95 was amended in April 2006, "effective for license years beginning after December 31, 2007." The amendment substantially rewrote § 11-51-95.
[4] We recognize that in Motors Insurance Corp. v. City of Birmingham, 269 Ala. 339, 113 So.2d 147 (1959), this Court held that Motors Insurance Corporation could be classified as a fire-insurance company even though the only insurance it had ever issued was automobile insurance. However, Motors Insurance Corporation was also chartered as a fire-insurance company and had represented itself to the State Department of Insurance as a fire-insurance company in order to receive favorable tax treatment.
[5] The legislature amended § 11-51-95 so as to substantially rewrite that section. The amendment is effective for "license years after December 31, 2007."
[6] City of Birmingham v. State Farm Mutual Auto. Insurance Co., 382 So.2d 1111 (Ala. 1980), discussed in the main opinion, does not compel a contrary conclusion to the one I reach. Among other things, the issue we must decide in the present case was not presented to this Court in City of Birmingham. As the opinion in City of Birmingham noted, "[t]he arguments of counsel for both sides [took the] position" that it was the "character of the company itself," rather than the character of the insurance sold, that should govern in that case. 382 So.2d at 1114. Further, as the main opinion in this case notes, § 11-51-95 was not addressed in City of Birmingham. City of Birmingham, therefore, is distinguishable from the present case.
[7] Although not discussed in the text of this writing, I also dissent from the main opinion as to the issue of the required contribution to the City of Mobile, Alabama, Police & Firefighters Retirement Plan.